UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CRIMINAL ACTION NO. 1:05CR-11-M

UNITED STATES OF AMERICA                                                          PLAINTIFF

V.

JERRY D. RONE                                                                               DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendant, Jerry D. Rone, to suppress all physical and testimonial evidence obtained as a result of the search of his vehicle [DN 23]. On April 24, 2006, a suppression hearing was held. There appeared Larry Fentress for the United States and Joseph Kirwan, counsel for Defendant, Jerry D. Rone. Defendant filed a post-hearing memorandum [DN 31] and the Government filed a response [DN 35]. Fully briefed, this matter is ripe for decision. For the reasons set forth below, the motion to suppress is **denied**.

## BACKGROUND

On May 18, 2004, officers of the Kentucky State Police stopped the Defendant, Jerry D. Rone, at a traffic checkpoint/roadblock located at the intersection of Kentucky Highways 185 and 526 in Warren County, Kentucky. Trooper John Williams testified that this particular location was on a list of approved locations for road safety checkpoints. Furthermore, Trooper Williams testified that earlier in the evening of May 18 he requested permission to set up the traffic checkpoint.

Defendant approached the traffic checkpoint headed northbound on Kentucky Highway 185. Trooper Williams approached Defendant's pickup truck from the front of the vehicle and asked him for his license. Defendant was wearing a black ball cap with the word "POLICE" in white letters across the front. Trooper Williams asked Defendant if he was a police officer and Defendant answered "no." As the Defendant handed Trooper Williams his operator's license, Trooper Williams smelled anhydrous ammonia, ether, and lithium. Trooper Williams testified that he recognized the odors from his experience with methamphetamine investigations and from special advanced training. Recognizing the odor, Trooper Williams became suspicious that there might be a methamphetamine lab in the truck.

Given this information, Trooper Williams asked the Defendant to step out of the truck. As both the Defendant and Trooper Williams were walking to the back of the truck, Trooper Williams saw in plain view in the bed of the truck an air tank with a tampered valve and a turquoise discoloration around the valve. Trooper Williams testified that in his experience, this discoloration usually indicates that the tank contains anhydrous ammonia. Trooper Williams also observed in plain view two containers of salt which is commonly used in the manufacture of methamphetamine. At this point, Trooper Williams informed Trooper Matt Travis of the items he had seen in the bed of the truck. Trooper Travis began to pat Defendant down. Trooper Williams asked Defendant if he had anything illegal on him. Defendant said he did not. Trooper Williams then cuffed Defendant for safety reasons. (Transcript at 15-16.)

The combination of the odor and the items observed in plain view led Trooper

Williams to believe he had probable cause to search the truck bed for a methamphetamine lab. Trooper Williams testified that prior to searching the truck bed, he advised Defendant of his Miranda rights. Trooper Williams then searched the bed of the truck and found pseudoephedrine and other ingredients for a methamphetamine lab. Trooper Williams arrested Defendant. Trooper Travis then searched the interior of the truck and found the firearms charged in the Indictment. (Transcript at 18-19, 54.)

Defendant filed a motion to suppress all physical and testimonial evidence. Defendant argues that the checkpoint conducted by the Kentucky State Police on May 18, 2004, violated the Fourth Amendment to the United States Constitution. Defendant contends that under City of Indianapolis v. Edmond, 531 U.S. 32 (2000), his detention at the checkpoint was illegal because the primary purpose of the checkpoint was drug interdiction. Defendant also argues that all his statements were made in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and should be suppressed.

## DISCUSSION

### A. Roadblock/Checkpoint

"The Supreme Court has made it clear that persons stopped for any purpose at motorist 'checkpoints' set up by government officials on public highways have been seized for Fourth Amendment purposes." United States v. Huguenin, 154 F.3d 547, 551 (6th Cir. 1998)(citing Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450 (1990); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976)). "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." Edmond, 531 U.S.

3

at 37. The Supreme Court has recognized limited exceptions to the "general rule that a seizure must be accompanied by some measure of individualized suspicion." Id. at 41.

With respect to checkpoints, the Supreme Court has "upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, . . . and at a sobriety checkpoint aimed at removing drunk drivers from the road." Edmond, 531 U.S. at 37 (citing Martinez-Fuerte, 428 U.S. 543 and Sitz, 496 U.S. 444 ). The Supreme Court has also "suggested that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible." Edmond, 531 U.S. at 38 (citing Delaware v. Prouse, 440 U.S. 648, 663 (1979)). In Delaware v. Prouse, the Supreme Court acknowledged the States' "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." 440 U.S. at 658. The Supreme Court then suggested that "'[q]uestioning of all oncoming traffic at roadblock-type stops' would be a lawful means of serving this interest in highway safety." Edmond, 531 U.S. at 39 (quoting Prouse, 440 U.S. at 663).

In City of Indianapolis v. Edmond, 531 U.S. 32 (2000), the Supreme Court held that a checkpoint program with the primary purpose of interdicting illegal narcotics violated the Fourth Amendment. In explaining this decision, the Supreme Court stated:

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. . . . [E]ach of the checkpoint programs that we have approved was designed primarily to

>serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.

Id. at 41-42. See also United States v. Barajas-Chavez, 236 F. Supp.2d 1279, 1281 (D. N.M. 2002).

Defendant maintains that the primary purpose of the checkpoint in question was drug interdiction; and as a result, under the holding of City of Indianapolis v. Edmond it was unconstitutional. In support of his motion, Defendant asserts that the discovery of methamphetamine lab components on other occasions at this checkpoint location is evidence that the purpose of the checkpoint was drug interdiction. Defendant also challenges the testimony of Trooper Williams that all the state troopers present at the checkpoint were DUI certified. Defendant further argues that the procedures adopted by the Kentucky State Police for establishing checkpoints/roadblocks were not followed. Specifically, Defendant contends that the Communication Log reflects that when Trooper Williams asked for the checkpoint to be approved, the officers were already present at the checkpoint. Further, Defendant argues that the officers had unlimited discretion in asking questions and that the checkpoint site selection did not comply with the policy requirement that roadblocks must be held at a location clearly visible to oncoming traffic.

*Primary Purpose*

Considering the testimony at the suppression hearing, the Court finds that the checkpoint at issue was organized by the Kentucky State Police for the primary purpose of

traffic safety. Trooper Williams testified that the purpose of the checkpoint was to make sure that drivers were within the law with respect to their driver's license, insurance, registration for their vehicles; were not impaired; and were using seat belts and child safety restraints. Defendant failed to put forth any evidence to the contrary. Trooper Williams further testified that this particular location was on a list of approved locations for road safety checkpoints. The Communication Log reflects the officers conducted 100 inspections at the checkpoint which resulted in "12 citations, 9 criminal arrest, 4 criminal cases, [and] 8 courtesy notices." The 12 citations and the 8 courtesy notices issued at the checkpoint supports Trooper Williams's statement that the primary purpose of the checkpoint was traffic safety. Furthermore, the fact that the officers previously seized methamphetamine components from other individuals at the same location does not itself create an inference that the purpose of this checkpoint was drug interdiction. Finally, while the Defendant challenges the testimony of Trooper Williams that all state troopers are DUI certified, the Court credits the undisputed testimony of Trooper Williams with regard to this matter. Clearly, the record reflects that the primary purpose of the checkpoint was traffic safety.

*Constitutionality of the Checkpoint*

Having determined that the primary purpose of the checkpoint was traffic safety, the Court must determine now whether the checkpoint was constitutional. See, e.g., Edmond, 531 U.S. at 47.[1]  Whether a checkpoint program satisfies the constitutional requirements of

---

[1] The Supreme Court in Edmond stated that "[i]t goes without saying that our holding today does nothing to alter the constitutional status of the sobriety and border checkpoints that

the Fourth Amendment is determined by the test established in Brown v. Texas, 443 U.S. 47 (1979). United States v. Huguenin, 154 F.3d 547, 552 (6th Cir. 1998); Sitz, 496 U.S. at 450. "The test weighs the 'gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" Id. (citing Brown v. Texas, 443 U.S. at 50-51). "In considering the severity of the intrusion on individual liberty, the court must consider both the objective intrusion of the seizure – the duration of the stop and the intensity of any brief questioning and visual inspection that might attend it – and its subjective intrusion – its potential for generating fear and surprise to law-abiding motorists." Huguenin, 154 F.3d at 552(citing Sitz, 496 U.S. at 451).

First, the purpose of the checkpoint, traffic safety, clearly satisfies the first factor – the gravity of the public concern. See Edmond,531 U.S. at 38; Prouse, 440 U.S. at 663. Second, the Court finds that second factor, effectiveness of the checkpoint in meeting the government's goal, weighs in favor of the constitutionality of the checkpoint in question. As noted above, the Communication Log indicates that the officers conducted 100 inspections which resulted in "12 citations, 9 criminal arrest, 4 criminal cases, [and] 8 courtesy notices." While the Court cannot determine from the Communication Log the number of criminal arrest made for DUI, it is significant that the officers issued 12 citations and 8 courtesy

---

we approved in Sitz and Martinez-Fuerte, or of the type of traffic checkpoint that we suggested would be lawful in Prouse. The constitutionality of such checkpoint programs still depends on a balancing of the competing interests at stake and the effectiveness of the program." 531 U.S. at 47(citing Sitz, 496 U.S. at 450-455; Martinez-Fuerte, 428 U.S.at 556-564).

notices related to traffic safety.

With respect to the third factor – the severity of the intrusion of the checkpoint on Fourth Amendment rights, the Court finds that this factor also weighs in favor of the constitutionality of the checkpoint. Contrary to the argument of the Defendant, under the Kentucky State Police policy and the procedure outlined by Trooper Williams, the individual officers were limited in their discretion in conducting the roadblock. The Kentucky State Police General Order OM-B-14 provides that "[o]fficers shall not establish a stationary roadblock without the approval of a supervisor." (Defendant's Exhibit 9 at 2.) Trooper Williams testified that he requested approval of the roadblock at Highways 182 and 526 earlier in the evening of May 18, 2004. The Communication Log reflects that the officers arrived at the traffic safety check point at 9:30 p.m. Contrary to Defendant's argument, there is no indication on the Communication Log when the Kentucky State Police Supervisor actually received Trooper Williams's request for the traffic safety checkpoint. The Court credits Trooper Williams's testimony that he received prior approval to conduct a traffic safety checkpoint. Therefore, based upon the evidence submitted by the parties, the Court finds that the location of the checkpoint was pre-approved and the individual officers did not have discretion to establish a checkpoint at any location in Warren County.

Furthermore, Trooper Williams testified that the standard procedure followed by the officers in conducting a checkpoint was to stop every car, to ask for production of a driver's license and proof of registration, to make sure the occupants had their seat belts on, and to observe impairment. (Transcript at 7.) In the present case, the checkpoint consisted of brief

stops of vehicles by the officers and was limited to a few questions relevant to traffic safety. There is no evidence in the record that the officers deviated from this procedure.

Finally, Trooper Williams testified that the roadblock was established in a location that was clearly visible to oncoming traffic. Trooper Williams further testified that an oncoming motorist could see the roadblock for approximately one-half mile. Trooper Williams also indicated the officers had their lights and spotlights activated. The Court credits the testimony of Trooper Williams and finds that approaching motorist could see that every vehicle was being stopped and there were visible signs of the officers' authority. See Sitz, 496 U.S. at 453.

Given that the Court has previously determined that the primary purpose of the checkpoint was traffic safety, the Court finds that the governmental interest in question is highway safety, and the checkpoint "at which all oncoming traffic was stopped for questioning, was a 'lawful means of serving this interest in highway safety.'" Barajas-Chavez, 236 F. Supp.2d at 1283 (citing Edmond, 531 U.S. at 39). Therefore, the checkpoint was reasonable under the balancing test set forth in Brown v. Texas.

### B. Search Incident to Arrest

After the Defendant was arrested, the officers searched the interior of the truck and discovered the firearms in question. (Transcript at 19, 54.) "[W]hen a police officer has made a lawful custodial arrest of an occupant of an automobile, the Fourth Amendment allows the officer to search the passenger compartment of that vehicle as a contemporaneous incident of arrest." Thornton v. United States, 541 U.S. 615, 617 (2004) (citing New York

v. Belton, 453 U.S. 454 (1981)). The firearms were therefore properly seized pursuant to a search incident to arrest.

### C. Statements

In his motion to suppress, Defendant requests the Court to suppress any statements made by Defendant. Defendant argues that the officers testified that the Defendant was questioned about whether he had any illegal contraband on him or in the vehicle prior to being advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

Trooper Williams testified that when he detained Defendant he asked the Defendant "if he had any illegal items on him." Defendant responded "no." While there appears to be some confusion regarding whether the Defendant was given his Miranda warnings prior to this question (Transcript at 53), the Court finds that the question asked by Trooper Williams reasonably related to the officers' safety and was made in connection with the pat down of Defendant. While the Court recognizes that the Defendant was not free to leave, based on the facts as described by Trooper Williams the detention of the Defendant had not evolved into a custodial arrest. See, e.g., United States v. Moore, 2006 WL 897968, *4 (E.D. Tenn. April 4, 2006). "The very nature of a Terry stop means that a detainee is not free to leave during the investigation, yet is not entitled to Miranda rights." Id. (quoting United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003)).

In as much as Defendant argues that his post-arrest statements were obtained in violation of Miranda v. Arizona, the Court rejects this argument. The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal

case to be a witness against himself." U.S. CONST. amend. V. The United States may not, therefore, use statements stemming from custodial interrogation of the Defendants without first demonstrating the use of procedural safeguards effective to secure the privilege against self-incrimination. <u>Miranda</u>, 384 U.S. at 478-79. Trooper Williams presented uncontradicted testimony that Defendant was given his <u>Miranda</u> warnings prior to Defendant stating that "someone . . . had called him and asked him to bring all the methamphetamine making items out to him." (Transcript at 53, 56). The Court credits Trooper Williams's testimony and finds that the Defendant was given his <u>Miranda</u> warnings prior to this statement.

## CONCLUSION

For the reasons set forth above, the motion by Defendant, Jerry Rone, to suppress the physical and testimonial evidence [DN 23] is **denied**.

cc:  counsel of record
     US Marshall
     US Probation